UNITED STATES OF AMERICA
UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

ALAA AL TAMIMI,

                    Petitioner,                    Case No. 1:12-cv-358

v.                                          Honorable Janet T. Neff

MARY BERGHUIS,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

        This is a habeas corpus action brought by a state prisoner pursuant to 28 U.S.C. § 2254.  Petitioner was convicted by a jury in the Ingham County Circuit Court of four counts of first-degree criminal sexual conduct (person under 13, defendant 17 or older), MICH. COMP. LAWS § 750.520b.  On April 28, 2010, Petitioner was sentenced to serve four concurrent prison terms of 25 to 37.5 years.  In his *pro se* petition, Petitioner raises two grounds for relief, as follows:

I.        MR AL-TAMIMI IS ENTITLED TO A NEW TRIAL WHERE DEFENSE COUNSEL PROVIDED CONSTITUTIONALLY INEFFECTIVE ASSISTANCE BY; (1) ALLOWING THE JURY TO VIEW THE INITIAL VIDEOTAPED INTERVIEW OF EZ; (2) FAILING TO REQUEST THAT ONLY PORTIONS OF THE VIDEO BE VIEWED AS IMPEACHMENT; AND (3) FAILING TO SHOW THAT THE ACCOUNTS OF THE COMPLAINING WITNESS WERE THE PRODUCT OF SUGGESTIVE AND COERCIVE INTERVIEWING TECHNIQUES THROUGH CROSS-EXAMINATION AND THE USE OF AN EXPERT WITNESS.

II.       MR AL-TAMIMI IS ENTITLED TO A NEW TRIAL WHERE THE PROSECUTION WITHHELD EXCULPATORY EVIDENCE IN VIOLATION OF HIS CONSTITUTIONAL RIGHT TO DUE

PROCESS. THE COURT ERRED IN DENYING COUNSEL'S
MOTION FOR A MISTRIAL.

Respondent has filed an answer to the petition (docket #8) stating that the grounds should be denied

because they have no merit.  Upon review and applying the AEDPA standards, I find the petition is

meritless.  Accordingly, I recommend that the petition be denied.

### Procedural History

**A.**      **Trial Court Proceedings**

The state prosecution arose from allegations that Petitioner used his penis to orally

and anally penetrate an acquaintance, E.Z., who was four or five years old at the time.  Defendant

denied committing the penetrations.  Petitioner was charged with four counts of first-degree criminal

sexual conduct, and following a preliminary examination on May 13, 2009, he was bound over on

the charges.  Petitioner was tried before a jury beginning March 1, 2010, and concluding on March

5, 2010.[1]

E.Z., who was six years old at the time of trial, testified that Petitioner was a neighbor

who lived in the same apartment building.  (Tr. I, 40.)  Petitioner touched her butt and her private,

which she had previously defined as her vagina.  (*Id.* at 31-39.)  Petitioner's dick, the word she used

to identify a penis, touched her butt more than once when she was alone in his apartment with him.

(*Id.*)  His dick was inside her butt and it hurt.  (*Id.* at 41.)  His dick also touched her inside her mouth

more than once when she was alone with him in his apartment.  (*Id.* at 42.)  She was outside by

---

[1]The trial transcript will be referred to as follows:
"Tr. I" - Trial Transcript Volume I, March 1, 2010 (docket #13)
"Tr. II" - Trial Transcript Volume II, March 2, 2010 (docket #14)
"Tr. III" - Trial Transcript Volume III, March 4, 2010 (docket #15)
"Tr. IV" - Trial Transcript Volume IV, March 5, 2010 (docket #16).

herself when he brought her into his apartment.  (*Id.* at 42.)  She did not tell her mom what Petitioner

did because she was afraid something was going to happen.  (*Id.*)  E.Z. testified that Petitioner had

something pink on his dick.  (*Id.* at 43.)  E.Z. also testified that she saw a little water, that was white,

come out of his dick.  (*Id.*)  Petitioner showed movies with grown ups who had no clothes on.  (*Id.*)

He told her to do what they were doing in the movies.  (*Id.* at 44.)  It happened six or seven times

with her butt and every time it was inside her butt.  (*Id.* at 46.)  It happened six times with her mouth.

(*Id.*)  After she told her mom, they went to the police.  (*Id.* at 58.)  Petitioner was not living in the

building when she told her mom what happened.  (*Id.* at 44.)

Ghaidaa Raad, E.Z.'s mother, testified that she and her two daughters, E.Z. and her

younger sister, left their home country of Iraq and arrived in the United States on October 18, 2007

as refugees.  (*Id.* at 64-66.)  Raad is married but her husband was in Syria.  (*Id.* at 66.)  Raad and

her daughters lived in an apartment at 824 Conrad Street when they first arrived in the United States.

(*Id.* at 67.)  Other people from Iraq lived in the same building.  (*Id.*)  When she first arrived she did

not have a job or a car.  (*Id.*)  She and her two daughters met Petitioner within two or three weeks

of moving into the apartment on Conrad Street and they became friends.  (*Id.* at 68-69.)  He loaned

her a small T.V. and would sometimes pick up groceries for her, but she paid for the groceries.  (*Id.*

at 70.)  She once went to the lake with Petitioner and once she went to the grocery store with him.

(*Id.* at 70.)  Raad was never romantically involved with Petitioner.  (*Id.* at 71.)  She has never seen

him naked, but she once saw him in his underwear.  (*Id.*)  She has been in Petitioner's apartment,

but neither she nor her daughters have ever slept there and she has never asked him to babysit her

daughters.  (*Id.* at 72.)  Petitioner was eventually evicted from his apartment, although he came back

three times to visit with Raad and her daughters, including one time when he took them to the lake. (*Id.* at 73.)

Raad, who is Muslim, testified that she had never discussed body parts with E.Z. because it would be embarrassing, although she has talked with E.Z. about sin. (*Id.* at 75.) Raad told E.Z. that an unmarried man and woman should not kiss because it is unacceptable and unlawful from a religious perspective. (*Id.* at 75.) After the last time Petitioner visited Raad's apartment, she saw E.Z. sitting alone and weeping. (*Id.* at 77.) Raad panicked and asked E.Z. to tell her if she did anything wrong. (*Id.*) E.Z. told Raad that she did not do anything wrong, but that she wanted to let Raad know what happened. (*Id.* at 78.) After E.Z. told Raad what happened, Raad felt that she wished she could have a chance to kill Petitioner. (*Id.*) Raad explained that she did not mean she was going to kill him, but she felt like killing him. (*Id.* at 79.) After E.Z. told her what happened Raad told a friend, and the next day, Raad, her friend and her daughters went to the police, and then to Sparrow Hospital. (*Id.* at 79-80.)

On cross-examination, Raad explained that she had never seen Petitioner in his underwear, but had seen him in shorts. (*Id.* at 98.) Additionally, she explained that E.Z. and her younger sister sometimes would visit Petitioner in his apartment without Raad. (*Id.* at 101.)

On redirect, Raad testified that she always told E.Z. that she should not lie, that lying is wrong and that if she did lie, "God might send you to the hellfire." (*Id.* at 104.)

On re-cross-examination, Raad testified that during the time that Petitioner lived in the apartment Raad would help E.Z. clean up after E.Z. had a bowel movement. (*Id.* at 110.) More than once when Raad was cleaning E.Z. after a bowel movement, E.Z. would tell her that an area around her anus was painful, to watch out and take it slow. (*Id.* at 110-11.)

- 4 -

Leann Holland, a nurse at Sparrow Hospital since 1998 and a certified SANE (Sexual Assault Nurse Examiner) nurse, testified that on March 12, 2009 at approximately 11:00 p.m. she conducted a sexual assault examination of E.Z., who was five years old at the time of the examination.  (Tr. III, 9-10, 14-15.)  E.Z. was with her mother, an interpreter and a crisis counselor.  (*Id.* at 14.)  Holland completed a report regarding the examination. (*Id.*)  She communicated with E.Z.'s mother through an interpreter to find out what had happened, and to get a medical history.  (*Id.* at 17-19.)  Holland conducted an examination of E.Z.'s body and genitalia but did not see any injury or anything abnormal for a five-year old girl.  (*Id.* at 25.)

Stephen Guertin, M.D., the Director of the Pediatric Intensive Care Unit at Sparrow Children's Center and a physician member of the Child Safety Program, which is the child abuse evaluation team, testified as an expert under MICH. R. EVID. 702.  (*Id.* at 58-60.)  Guertin testified that he reviewed the records regarding the victim in this case, but did not perform a physical examination because one had already been performed by the SANE nurse, and the examination was normal.  Consequently, there would be no reason to perform a second examination.  (*Id.* at 60-62.)  He understood that the allegations were that the victim had been repeatedly sodomized.  (*Id.* at 62.)  Guertin testified that in such cases you would not expect to find anything abnormal unless the child-victim was examined within hours or days of the event.  (*Id.* at 62.)  He explained that: "Sodomy almost never leaves permanent marks, or marks that would be found months later."  (*Id.* at 62.)  He further explained that: "It would be a very rare thing for [an examiner] to have a physical finding, after sodomy, examining a child months after the last contact." (*Id.* at 66.)

Elizabeth Reust, a Detective with the Lansing Police Department for 20 years and assigned to investigate crimes against children, testified that she interviewed E.Z. in English and

followed a forensic interviewing protocol. (*Id.* at 88, 92.) The forensic protocol is a method used for interviewing children so that the interviewer is not leading the statements, but instead is allowing the child to tell the story. (*Id.* at 89.) Forensic interviewing requires hypotheses testing, which requires the interviewer to come up with several hypothesis that can explain an event as something other than abuse. (*Id.* at 90.) An interviewer uses hypothesis testing to ensure that the interviewer is not guiding a child to an assumed result. (*Id.* at 90.) Reust testified that during her interview with E.Z., E.Z. described a scar on Petitioner's penis and drew a picture with a pink spot to demonstrate. (*Id.* at 152.) After interviewing E.Z., she determined that Petitioner was a suspect and obtained several search warrants. (*Id.* at 92.) On April 21, 2009, she searched 328 Holmes, which is the house where Petitioner had lived with his girlfriend Sherry Henry. (*Id.* at 92-93.) Reust met with Petitioner and Henry and explained that she was looking for pornographic material. (*Id.* at 93.) Henry was hostile, but directed Reust to the DVD player which contained a pornographic DVD that Reust seized. (*Id.* at 94-95.) She found another DVD in a black case that had slots for CDs and DVDs. (*Id.* at 95.) Henry told her that Petitioner brought the DVDs with him when he moved in and they belonged to him. (*Id.* at 97.) Reust testified that the DVDs she seized showed oral and anal penetration, conduct which mirrored the allegations in the case. (*Id.* at 97-98.)

Kevin Kilbourn, a Sergeant with the Lansing Police Department, executed a search warrant to obtain photos of Petitioner's penis. The photos he took were shown to the jury. (*Id.* at 102-104.)

After the trial court carefully questioned Petitioner about his decision to testify and ensured that Petitioner understood that he had a right to remain silent, Petitioner confirmed that he understood his rights and that he still wished to testify. (*Id.* at 109-111.) Petitioner testified that he

was born in Iraq on June 10, 1976 and is living in the United States as a refugee. (*Id.* at 112.) While in Iraq, Petitioner was injured on the right side of his head, his left ear, his back, his chest, his penis, his thighs and his left foot, and has scarring in many places on his body as a result of these injuries. (*Id.* at 112-13.) Petitioner arrived in the United States on September 27, 2007. (*Id.* at 113.) He lived in an apartment building with other people from the Middle East. (*Id.* at 115.) He met Raad, E.Z. and her younger sister around October 18, 2007 at the apartment building where they also lived. (*Id.*) He lived in the apartment complex for 3-4 months at which time Raad became like a sister to him and her children like his own. (*Id.* at 117.) He did not have a DVD player at this time, although he had a video player and a CD player, and he did not have any pornography. (*Id.* at 116.)

Petitioner testified that E.Z. never came to his apartment alone, only with her mom and sister. (*Id.* at 118.) He visited Raad at her apartment many times. (*Id.* at 120.) He was left alone with the two girls one time in 2008. (*Id.* at 120.) Raad came to his apartment to ask if he would watch her kids, he was sleeping but agreed and went over to her apartment. (*Id.* at 121-22.) The girls were sleeping. (*Id.* at 122.) They woke up crying for their mom, so he made them breakfast and then their mom came home. (*Id.* at 122.) Raad would sometimes ask Petitioner to help find E.Z. because she would be outside playing by herself. (*Id.* at 123.) Sometimes Raad would beat the girls, especially E.Z., who was the older girl. (*Id.* at 124.) One time the girls came running to his apartment asking him to get Raad to stop beating them. (*Id.*)

He testified that he never sexually assaulted E.Z. (*Id.*) Eventually he moved to his girlfriend's house on Holmes. (*Id.* at 125.) He moved around June 29, 2008, bringing his clothes, a TV, a CD player and CDs, which were in a case. (*Id.*) He did not bring any pornographic movies with him. (*Id.*) He did bring Arabic action movies on DVD with him. (*Id.*) While living with

Henry he had Iraqi friends visit. (*Id.* at 126.) One time a friend of his brought a pornographic movie. (*Id.* at 127.)

Petitioner testified that E.Z. might have seen his penis once or twice unintentionally. (*Id.* at 128.) One time she came into his apartment when he was going to the bathroom and pushed open the bathroom door. (*Id.* at 129.) Another time he was sitting on the sofa with his leg up talking with his friend Ali. E.Z. and her sister were there and started laughing and pointing at him. Ali told Petitioner to cover himself and he put his leg down. (*Id.* at 130-131.) On the last occasion he went to the beach with his girlfriend, his friend Ali, with Raad and her two daughters. (*Id.* at 128.) While at the lake his friend Ali pushed him into the water and as Petitioner tried to run away, Ali pulled his shorts down. (*Id.* at 131.) E.Z. and her sister were close by when this happened. (*Id.* at 131.)

On cross-examination, Petitioner explained that he told the Arabic speaking officer who interviewed him that E.Z. and her sister may have accidentally seen his penis three times. (*Id.* at 134.) Petitioner denied telling the officer that it was not possible for E.Z. to have seen his penis. (*Id.*) Additionally, he described the scar on his penis as pinkish-white. (*Id.* at 135.) Defendant testified that he had never told the interviewing officer that E.Z. was beautiful or that Raad was a bad mother. (*Id.* at 137.) Additionally, Petitioner testified that he did not tell the interviewing officer that Raad was jealous of E.Z.'s beauty. (*Id.*)

Out of the presence of the jury, the Court and counsel discussed the late disclosure of a verbatim transcript of Petitioner's interview with Officer Ahmed Alkubani, an Arabic speaking police officer with the Dearborn Police Department, and Alkubani's partner, Corporal Keifer. (Tr. IV, 6-32.) Petitioner had timely received a summary of the interview, but was not aware of the existence of a verbatim transcript. Petitioner's counsel argued that inconsistencies between the

verbatim transcript and the interview summary rendered the trial fundamentally unfair, and as a result, the Court should dismiss the case.  (*Id.* at 18.)

In one instance, the prosecutor, apparently relying on what she had read in the interview summary, asked Petitioner on cross-examination if he had ever told the interviewing officer that E.Z. was beautiful, that Raad was a bad mother or that Raad was jealous of E.Z.'s beauty.  Defendant responded "no" to each of these questions.  (*see* Tr. III, 137.)  As it turned out, the verbatim transcript established that it was Corporal Keifer who suggested that E.Z. was beautiful and that maybe Raad was jealous of E.Z.  (*Id.* at 13.)

In another instance, the interview summary stated that Petitioner had described the scar on his penis as a "burn mark" that was "pinkish white in color."  (*Id.* at 14.)  In the verbatim transcript it is clear that Petitioner said "[i]t's not a burn, it's whitish from the injury" and "[i]t has a cut at the bottom and on top.  It is from the accident.  It is a scar and it is white."  (*Id.* at 14-15.)

The last notable inconsistency relates to Petitioner's statements regarding whether E.Z. might have seen his penis.  The interview summary stated that Petitioner at first denied that E.Z. could ever have seen his penis, until Petitioner was confronted with the fact that E.Z. had described a scar on his penis.  At that point the interview summary notes that Petitioner began describing instances in which E.Z. might have accidentally seen his penis. (Pet., App. C, docket #1-1, Page ID#47.)  Contrary to what was written in the interview summary, the verbatim transcript disclosed that the following exchange actually took place:

C [Keifer]:  How would the girl know and describe you.  She never saw you naked

A [Alkubani]:  Did she ever see you naked?

C [Keifer]:  She never saw you naked?

B [Petitioner]: Once I was coming out of the bathroom and the door was open.

A [Alkubani]: Maybe she saw you naked.

B [Petitioner]: No. no.

C [Keifer]: She has never seen you naked?

A [Alkubani]: Has she seen your penis accidentally?

B [Petitioner]: I do not know.  How do I know?

C [Keifer]: There is no way she could tell us about your penis.

A [Alkubani]: So, it is impossible that she knows anything about your penis?

B [Petitioner]: What are you talking about?

A [Alkubani]: It's not possible that she knows anything?

B [Petitioner]:   What are you talking about?

A [Alkubani]: It is not possible that she tells us about your penis and its color, right?

B [Petitioner]: (Laughing) what color?

A [Alkubani]: She is a 4 year old.  It is not possible that she tells us about . . .

B [Petitioner]: She is lying.

C [Keifer]: She shouldn't know if you're circumcised or not.

B [Petitioner]: I don't know, ask her.

A [Alkubani]: She told us.

B [Petitioner]: What did she tell you?

- 10 -

A [Alkubani] She described your penis.  How could she know that you are circumcised?

B [Petitioner]: I don't know.  Sometimes I wear shorts.

C [Keifer]: So she saw it that way.

A [Alkubani]: She might?

(*Id.* at Page ID#66.)  At that point in the interview, Petitioner began to describe the same three instances he testified to at trial in which E.Z. might have seen his penis.  (*Id.* at Page ID##66-68.)

Petitioner's counsel also raised concerns about information that was in the verbatim transcript and was not in the narrative summary.  In one instance, Petitioner was asked how many times he babysat E.Z. and her sister and he said, "[t]heir door is always open for me and my friend Allie [sic].  The kids also come to my apartment anytime Allie [sic] and I look after them."  (*Id.* at Page ID#61; *see also* Tr. IV, 15.)  Additionally, the verbatim transcript reflected that Petitioner said "[Raad] always let her little girl go out of the building by herself.  I reminded the lady many times to be careful, and not to let the girls play outside alone without any supervision."  (*Id.*; *see also* Tr. IV, 16.)  When asked whether E.Z. plays outside, Petitioner responded "yes, outside in the street. I fetched her from the street so many times."  (*Id.*)  With respect to the issue of pornography in the home, in the verbatim transcript Petitioner said he did not have any pornography, but he said that his girlfriend "had one sex movie because her husband died.  I don't know anything about it."  (*Id.* at Page ID#63; *see also* Tr. IV, 17.)

Petitioner's counsel argued that if the verbatim transcript had been timely disclosed he might have approached his case differently and asked different questions.  (Tr. IV, at 18.)

- 11 -

Nevertheless he acknowledged that the Court did not feel there were many inconsistencies between the verbatim transcript and the narrative summary. (*Id.*)

The prosecutor argued that the information that was disclosed late was information from Petitioner, and not a third party, that Petitioner's counsel could have obtained all this information by talking to Petitioner and at all times Petitioner's counsel had a narrative summary of the interview. (*Id.* at 23-24). The prosecutor argued that to the extent the late disclosure was prejudicial, any prejudice could be rectified by re-calling Petitioner to the witness stand. (*Id.* at 25.) Additionally, the prosecutor argued that to the extent there were any discrepancies between the narrative statement and the transcript Officer Alkubani could testify about them, the Court could provide an instruction to the jury, the parties could enter a stipulation or the parties could discuss whatever other remedy the Court believed would fix the problem, but a dismissal or mistrial would not be appropriate. (*Id.* at 25-26.)

After considering all the arguments, the Court stated:

> [I]'m not making a final ruling, but I'm not seeing anything here that--there's a consistent thread, in terms of the position of the Defendant, as stated on the record, and what's contained in the transcript here. And, so I just -- I'm not seeing here a denial of a -- you know, or any affront to standards of fundamental fairness here. I'm just not seeing it at this point in time.

(*Id.* at 32.) Eventually, the Court made a final ruling denying Petitioner's motion for dismissal, stating "I have to say, there are some little nuances, but they're pretty consistent with the testimony we've heard." (*Id.* at 33.)

Following the denial of Petitioner's motion to dismiss the Court engaged in a long colloquy with Petitioner and his counsel about the admission into evidence of the videotaped interview of E.Z. by Reust. (*Id.* at 35-38.) The Court questioned both Petitioner and his counsel

about whether it was their desire to have the videotape reviewed by the jury and admitted into evidence. (*Id.*) Both Petitioner and his counsel confirmed their assent. (*Id.*) The Court played the videotape for the jury. (*Id.* at 40-70 ) In the videotaped interview E.Z. described Petitioner's conduct using different words than she used at trial. For example, she called Petitioner's penis a "dick" at trial, but she called it a "pee-pee" in the interview and she called her vagina and her butt a "bouly."[2] (*Id.* at 57, 61.) Additionally, E.Z. explained that Petitioner had "something that's pink on his pee-pee" and she spontaneously placed a pink dot on a picture to indicate the location of the scar on Petitioner's penis. (*Id.* at 64.) Other than the difference in terms and the drawing of Petitioner's penal scar on a picture, the videotaped interview of E.Z was consistent with her in-court testimony regarding the anal and oral penetration by Petitioner.

After the videotaped interview was played for the jury, Alkubani was called as the final witness. Alkubani testified that he was asked to come to Lansing by Reust to interview Petitioner and translate questions that Reust had prepared into Arabic. (*Id.* at 72.) When he interviewed Petitioner, Keifer was also present and spoke to Petitioner, although Keifer does not speak Arabic. (*Id.* at 72-73.) Alkubani testified that Keifer was the person who suggested that Raad was jealous of E.Z.'s beauty and that Petitioner did not make this statement. (*Id.* at 73.) Alkubani explained that if there was confusion whether Petitioner had made this statement it was because at the time of the interview Alkubani was taking notes in a notepad and when he wrote his narrative summary he accidentally ascribed something that he or Keifer said as if it was Petitioner who said

---

[2]Alkubani explained that "bouly" is an arabic word "that's used for females when they urinate, instead of saying I have to go urinate, or pee they say I have to go bool." (Tr. IV, 72.)

it.  (*Id.*)  The prosecutor emphasized that it was not Petitioner who had made this statement as
follows:

> Q: Okay.  So to be clear, the Defendant never said that the mother was jealous
> of the girl's beauty?
>
> A: No, ma'am.
>
> Q: That was Corporal Keifer?
>
> A: Yes, ma'am.

(*Id*. at 73-74.)

Alkubani also testified that during the interview Petitioner at first denied E.Z. could
ever have seen him naked, but that Petitioner changed his answer later in the interview when
confronted with the fact that E.Z. had stated that Petitioner had certain marks on his penis.  (*Id.* at
74.)  Alkubani testified that Petitioner said the mark on his penis was whitish.  (*Id*. at 75.)
Additionally, Petitioner stated that he had never been in a romantic relationship with E.Z.'s mother
nor would E.Z.'s mother have any knowledge about the mark on his penis.  (*Id*.)

At the conclusion of trial, on March 5, 2010, the jury found Petitioner guilty of four
counts of first-degree criminal sexual conduct.  (Tr. IV, 137-38.)  On April 28, 2010, Petitioner was
sentenced to serve four concurrent terms of 25 to 37.5 years imprisonment.  (Sentencing Transcript,
(S. Tr.), 11, docket #17.)

### B.    Direct Appeal

Petitioner appealed as of right to the Michigan Court of Appeals.  His brief, which
was filed by counsel on December 6, 2010, raised the same two issues as raised in this application

for habeas corpus relief.  (*See* Def.-Appellant's Br. on Appeal, docket #18.)   Petitioner filed a *pro per* Standard 4 Brief in which he raised one issue:

> DEFENDANT-APPELLANT WAS DENIED HIS CONSTITUTION[AL] RIGHT TO PRESENT A DEFENSE WHEN HE WAS NOT INFORMED BY LAW ENFORCEMENT [,] THE PROSECUTION OR DEFENSE COUNSEL OF HIS STATUTORY RIGHT TO SUBMIT TO A POLYGRAPH EXAMINATION, THUS OBVIATING THE NEED FOR A TRIAL IN THE FIRST INSTANCE.

(*See* Def.-Appellant Pro Per Br. on Appeal, docket #18.)   Petitioner also filed a motion to remand, which was denied by the Michigan Court of Appeals on January 28, 2011.  (*See* 1/28/11 Mich. Ct. App. Ord, docket #18.)  By unpublished *per curiam* opinion issued on July 7, 2011, the Michigan Court of Appeals rejected all appellate arguments and affirmed Petitioner's convictions and sentences.  (*See* 7/7/11 Mich. Ct. App. Opinion (MCOA Op.), docket #18.)

Petitioner, through counsel, filed an application for leave to appeal to the Michigan Supreme Court.  (*See* Def.-Appellant Appl. for Leave to Appeal, docket #19.)  Petitioner raised the same two claims raised before and rejected by the Michigan Court of Appeals.  By order entered November 21, 2011, the Michigan Supreme Court denied his application for leave to appeal because it was not persuaded that the questions presented should be reviewed.  (*See* 11/21/11 Mich. Ord., docket #19.)

## Standard of Review

This action is governed by the Antiterrorism and Effective Death Penalty Act, PUB. L. 104-132, 110 STAT. 1214 (AEDPA).  *See Penry v. Johnson*, 532 U.S. 782, 792 (2001). The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  The AEDPA has "drastically changed" the nature of habeas review.  *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir.

2001).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."  28 U.S.C. § 2254(d).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v. Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).   In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v, Smith*, 135 S. Ct. 1, 4 (2014); *Bailey*, 271 F.3d at 655; *Harris v. Stovall*, 212 F.3d 940, 943 (6th Cir. 2000).  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 132 S. Ct. 38 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 132 S. Ct. at 44).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in our cases, or if it decides a case differently than we have done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  The court may grant relief under the "unreasonable

- 16 -

application" clause "if the state court correctly identifies the governing legal principle from our decisions but unreasonably applies it to the facts of the particular case." *Id.*  A federal habeas court may not find a state adjudication to be "unreasonable" "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." *Williams*, 529 U.S. at 411; *accord Bell*, 535 U.S. at 699.  Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." *Id.* at 410.  "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1706-07 (2014) (quoting *Harrington v. Richter*, 562 U.S. 86, 131 S. Ct. 770, 784 (2011)).

Where the state appellate court has issued a summary affirmance, it is strongly presumed to have been made on the merits, and a federal court cannot grant relief unless the state court's result is not in keeping with the strictures of the AEDPA. *See Harrington*, 131 S. Ct. at 784; *see also Johnson v. Williams*, 133 S. Ct. 1088, 1094 (2013); *Werth v. Bell*, 692 F.3d 486, 494 (6th Cir. 2012) (applying *Harrington* and holding that a summary denial of leave to appeal by a Michigan appellate court is considered a decision on the merits entitled to AEDPA deference).  The presumption, however, is not irrebuttable. *Johnson*, 133 S. Ct. at 1096.  Where other circumstances indicate that the state court has not addressed the merits of a claim, the court conducts *de novo* review. *See id.* (recognizing that, among other things, if the state court only decided the issue based on a state standard different from the federal standard, the presumption arguably might be overcome); *see also Harrington*, 131 S. Ct. at 785 (noting that the presumption that the state-court's

decision was on the merits "may be overcome when there is reason to think some other explanation

for the state court's decision is more likely"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) (reviewing

habeas issue *de novo* where state courts had not reached the question).

The AEDPA requires heightened respect for state factual findings. *Herbert v. Billy*,

160 F.3d 1131, 1134 (6th Cir. 1998). A determination of a factual issue made by a state court is

presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and

convincing evidence. 28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir.

2003); *Bailey*, 271 F.3d at 656. This presumption of correctness is accorded to findings of state

appellate courts, as well as the trial court. *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v.

Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989). Applying the foregoing standards under the AEDPA,

I find that Petitioner is not entitled to relief.

## Discussion

### A.    Ineffective Assistance of Trial Counsel

In his first ground for relief, Petitioner claims that his trial counsel rendered

ineffective assistance by allowing the jury to view the entire videotaped interview of E.Z. as

substantive evidence and by failing to exclude Detective Reust's description of the forensic

interviewing technique. Specifically, Petitioner contends that absent counsel's strategic decision to

present the videotaped interview, the videotape would not have been admissible as substantive

evidence because it was hearsay and did not fall under any of the exceptions to the hearsay rule.

Thus, he argues, counsel erred in allowing the jury to view the otherwise inadmissible videotape and

this error constituted deficient performance, unjustified by any reasonable trial strategy.

Additionally, Petitioner contends that his counsel was ineffective for failing to call an expert witness

to testify regarding forensic interviewing techniques and for failing to challenge Reust's unreliable and suggestive interview through cross-examination.

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome.  A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689.  The defendant bears the burden of overcoming the presumption that the challenged action might be considered sound trial strategy.  *Id.* (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)); *see also Nagi v. United States*, 90 F.3d 130, 135 (6th Cir. 1996) (holding that counsel's strategic decisions were hard to attack).  The court must determine whether, in light of the circumstances as they existed at the time of counsel's actions, "the identified acts or omissions were outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690.  Even if a court determines that counsel's performance was outside that range, the defendant is not entitled to relief if counsel's error had no effect on the judgment.  *Id.* at 691.

With respect to the prejudice prong of the *Strickland* test, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The prejudice prong "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or

the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). Therefore, the prejudice inquiry must not focus solely on mere outcome determination; attention must be given to "whether the result of the proceeding was fundamentally unfair or unreliable." *Id.* at 369.

When deciding ineffective-assistance claims, courts need not address both components of the inquiry 'if the defendant makes an insufficient showing on one.'" *Campbell v. United States*, 364 F.3d 727, 730 (6th Cir. 2004) (quoting *Strickland*, 466 U.S. at 697). "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." *Strickland*, 466 U.S. at 697. Moreover, a habeas petitioner is entitled to relief on an ineffective-assistance claim only if the state court's rejection of that claim was "contrary to, or involved an unreasonable application of" *Strickland*, or rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). *Sneed v. Johnson*, 600 F.3d 607, 610 (6th Cir. 2010).

Relying on the same standard as that set forth in *Strickland*, 446 U.S. at 687-88, the Michigan Court of Appeals rejected Petitioner's arguments as follows:

> Defendant argues that his attorney, Mark Kamar, rendered ineffective assistance of counsel.
>
> To establish ineffective assistance of counsel, defendant must show that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms. *People v Daniel*, 207 Mich App 47, 58; 523 NW2d 830 (1994). Defendant must further demonstrate a reasonable probability that, but for counsel's error, the result of the proceedings would have been different, and the attendant proceedings were fundamentally unfair or unreliable. *People v Poole*, 218 Mich App 702, 718; 555 NW2d 485 (1996) (emphasis in original). Effective assistance of counsel is presumed, and the defendant bears a heavy burden of proving otherwise. *People v Rockey*, 237 Mich App 74, 76; 601 NW2d 887 (1999). [*People v Rodgers*, 248 Mich App 702, 714; 645 NW2d 294 (2001).]

Defendant contends that Kamar should not have allowed the jury to view the otherwise inadmissible videotape of an interview of E.Z. conducted by Detective Elizabeth Reust. In an affidavit, Kamar indicated that his decision to allow the jury to view the videotape was "a major strategic error, prompted by the court's request to show the tape."  Kamar also indicated that he "did not consider playing only certain portions of the video for impeachment purposes only" and that he "did not consider requesting an adjournment so that an expert in forensic interviewing techniques could evaluate the video and testify to the jury about any flaws in the interview."  Kamar stated that he "had no strategic basis for this failure."

Defendant argues that "[t]he videotaped interview corroborated and buttressed E.Z.'s otherwise problematic account of abuse." Defendant particularly takes issue with E.Z.'s drawing, during the course of the videotaped interview, a scar that she saw on defendant's penis.  Defendant contends that this action corroborated the photographs of the scar on defendant's penis and was far more damaging than E.Z.'s trial testimony about "something pink" being on defendant's penis.

We find no basis for reversal. Before the jury was allowed to view the videotape, the trial court had an extensive discussion with both Kamar and defendant to ascertain whether they wanted the jury to view it. Both Kamar and defendant indicated that they did.

*  *  *

Clearly, counsel chose to play the videotape as part of his trial strategy, to show the jury that E.Z. had used different terminology in recounting the incidents to Reust and had in general presented the information about the incidents differently in her statement to Reust than she had at trial.  We will not second-guess trial strategy with the benefit of hindsight. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004). "The fact that defense counsel's strategy may not have worked does not constitute ineffective assistance of counsel." *People v Stewart*, 219 Mich App 38; 555 NW2d 715 (1996).

Defendant argues that even if counsel wanted the jury to view certain portions of the videotape for impeachment purposes, he should have allowed the jury to view only portions of the tape.  However, it is speculative that the trial court would have entertained a hearing regarding redaction of the tape and then allowed only portions to be allowed into evidence.  Moreover, despite counsel's later assertions in his affidavit, it appears to have been a valid strategic decision, which we will not second-guess, to allow the jury to view the entire videotape and hear all E.Z.'s statements in context.  Again, the trial court held an extensive discussion with Kamar and defendant, and Kamar and defendant concluded that the jury should view the tape.

- 21 -

At any rate, even assuming, for purposes of argument, that counsel erred in allowing the entire videotape into evidence, we cannot find that this action affected the outcome of the proceedings and rendered them unfair or unreliable. *Rodgers*, 248 Mich App at 714. Indeed, E.Z.'s statements to Reust were largely cumulative to her testimony at trial. To the extent that E.Z.'s statements to Reust differed from her statements at trial, Kamar emphasized this during his closing arguments and also argued that E.Z. had been asked leading questions during her interview with Reust. Counsel used the videotape to make plausible arguments on behalf of his client.

Defendant argues that the information E.Z. gave during the interview about a scar on his penis was particularly damaging. However, E.Z. mentioned "something pink" on defendant's penis during her trial testimony, and, during his trial testimony, defendant admitted that he had a "pinkish white" mark on his penis. He testified that there were three incidents during which E.Z. might have accidentally seen his penis, specifically a time when she and her sister walked in on him in a bathroom, a time when he was sitting on a sofa and E.Z. and her sister laughed and told him to cover himself and he immediately put his legs down, and a time when a friend pulled down his shorts as a joke when he was at a lake with E.Z. and her family. We cannot conclude that E.Z.'s additional information about the scar during the interview with Reust affected the outcome of the case, in light of the evidence already admitted.

Reust also testified, after defendant's testimony and before the videotape evidence, that E.Z. had told her that defendant had a "pink spot" on his penis. Defendant argues that counsel should have objected to this testimony because it was inadmissible. This argument has not been properly presented for review because it was not included in the statement of questions presented for appeal. *People v Brown*, 239 Mich App 735, 748; 610 NW2d 234 (2000). At any rate, Reust's testimony was cumulative to E.Z.'s and we cannot find that it affected the outcome of the proceedings or rendered them unfair or unreliable. *Rodgers*, 248 Mich App at 714.

Defendant argues that Kamar was ineffective for failing to call an expert witness to testify about the interviewing techniques of Reust and for failing to demonstrate through cross-examination that the interview was based on suggestive interviewing techniques. However, defendant provides no affidavit or other evidence by a potential expert witness to demonstrate that the interview was improper. In fact, Reust testified that she had been specially trained to interview children and to elicit information without leading. She stated that "you want to make sure that as an interviewer [you are] not guiding the child to an assumed result." Defendant has advanced only speculation in support of his argument for an expert witness. Moreover, we note that counsel did in fact argue vigorously during closing arguments that the interview of E.Z. had been based on leading questions; we cannot conclude that any additional cross-examination would have yielded a different trial outcome.

(7/7/11 MCOA Op. at 1-50 (footnotes omitted).)

        The Michigan Court of Appeals found that counsel's decision to allow the jury to view the videotape was not unsound trial strategy.  In determining what is reasonable, the reviewing court's scrutiny of counsel's performance must be highly deferential: that is, it "must indulge a strong presumption that counsel's conduct falls within a wide range of reasonable professional assistance . . . [and] that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " *Strickland*, 466 U.S. at 689.  Moreover, as the Supreme Court recently has observed, while "'[s]urmounting *Strickland*'s high bar is never an easy task,' . . . [e]stablishing that a state court's application was unreasonable under § 2254(d) is all the more difficult."   *Harrington v. Richter*, 562 U.S. 86, 105 (2011)  (2011)  (quoting *Padilla v. Kentucky*, 559 U.S. 356, 371, 130 S. Ct. 1473, 1485 (2010)).  Because the standards under both *Strickland* and § 2254(d) are highly deferential, "when the two apply in tandem, review is 'doubly' so." *Harrington*, 562 U.S. at 105 (quoting *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)).  In those circumstances, "[t]he question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id.*

        As the state court noted, at the time of trial, counsel clearly had a strategic reason for allowing the videotape to be viewed by the jury.  The trial court went through an extensive colloquy involving both Petitioner and his counsel probing their decision to allow the jury to view the videotape.  Under these circumstances, it is clear that counsel thoroughly assessed the reasonableness of allowing the jury to view the videotape and did so because he believed it would benefit his client. *See id*. at 689 ( recognizing that "[a] fair assessment of attorney performance requires that every

effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time").

Further, counsel's strategy is apparent.  Counsel must have believed that the information E.Z. presented during the videotaped interview was inconsistent from her trial testimony in a sufficiently marked way, that the jury would find her testimony unbelievable.  In light of all the circumstances at the time of counsel's conduct, trial counsel's actions were within the "wide range of professionally competent assistance." *Id*. at 690.

Even assuming that Petitioner's counsel was deficient for permitting the jury to view the entire videotaped interview of E.Z., Petitioner cannot show that counsel's deficient performance rendered the trial fundamentally unfair or unreliable.  *See Lockhart*, 506 U.S. at 372.  By the time the videotaped interview was played for the jury, the jury had already heard ample evidence to support its verdict.  E.Z. testified that Petitioner anally and orally penetrated her, that he did so when she was alone with him in his apartment, that she observed ejaculate coming from Petitioner's penis and that he showed her pornographic movies and urged her to "do what they were doing in the movies."  (Tr. I, 44.)  Additionally, E.Z. testified that Petitioner had something pink on his penis.  (*Id.* at 43.)

Raad testified that after the last time Petitioner visited Raad's apartment, she saw E.Z. sitting alone and weeping.  E.Z. eventually told Raad what had happened, which made Raad feel like she wanted to kill Petitioner.  (Tr. II, 77-79.)  The next day Raad, her friend and her daughters went to the police, and then to Sparrow Hospital.  (*Id.* at 79-80.)  Raad also testified that she always told E.Z. that she should not lie, that lying is wrong and that if she did lie, "God might send you to the hellfire."  (*Id.* at 104.)  Finally, Raad testified that during the time that Petitioner lived in the

- 24 -

apartment, more than once when Raad was cleaning E.Z. after a bowel movement, E.Z. would tell her that an area around her anus was painful, to watch out and take it slow. (*Id.* at 110-11.)

Petitioner's girlfriend, Sherry Henry, testified that Petitioner had access to at least two pornographic movies, even if it was unclear to whom the movies belonged, and Detective Reust confiscated two pornographic DVDs from Henry's house at the time Petitioner was living there. (Tr. III, 74, 94-95)  Reust testified that she had viewed the DVDs and ascertained that they showed acts of oral and anal penetration. (*Id.* at 97-98.) Dr. Guertin explained why there would not likely be any physical evidence that a young child had been sodomized. (*Id.* at 62-66.) Finally, Sergeant Kilbourn testified that he obtained photographs of Petitioner's penis pursuant to a search warrant and those photographs were shown to the jury.  Consequently, Petitioner cannot establish that he was prejudiced by counsel's performance because even before the jury viewed the videotape there was sufficient evidence to support the verdict. *Maupin v. Smith*, 785 F.2d 135, 140 (6th Cir. 1986) ("Given our conclusion that there was sufficient evidence to support Maupin's conviction, we conclude that counsel's alleged error did not result in such prejudice as to meet the second part of the *Strickland* standard.").

Moreover, although E.Z. did not draw a picture of Petitioner's penis with the pink spot at trial, before the videotape was shown to the jury Reust had testified that during her interview E.Z. had described a scar on Petitioner's penis and drew a picture with a pink spot to demonstrate where the scar was located on Petitioner's penis. (Tr. III, 152.)  Additionally, E.Z. had already testified that there was something pink on Petitioner's penis (Tr. I, 43) and the photographs of Petitioner's penis had been introduced into evidence via Sergeant Kilbourn. (Tr III, 102-104.) Thus, the videotape revealed nothing new to the jury.  Even if E.Z. provided more detail about the scar on

Petitioner's penis in the videotaped interview, that alone would not support a finding that the Petitioner's conviction was fundamentally unfair or unreliable.

Petitioner's claim that his counsel was ineffective for failing to call an expert witness to testify about the forensic interviewing techniques used by Reust and for failing to demonstrate through cross-examination that the interview was based on suggestive interviewing techniques is likewise meritless. As the state court noted, Petitioner speculated, but failed to offer any evidence by a potential expert witness to demonstrate that Reust's interviewing technique was improper. Moreover, the jury heard Petitioner's counsel explain that Reust used leading questions to get the responses she wanted to hear from E.Z. (*See e.g.*, Tr. IV, 99-100.) The jury did not need to hear an expert witness to decide whether Reust had used leading questions to get specific responses from E.Z. Given its verdict, amply supported by the evidence, the jury plainly rejected Petitioner's counsel's suggestion that Reust had led E.Z.

Moreover, courts generally entrust cross-examination techniques, like other matters of trial strategy, to the professional discretion of counsel. *Henderson v. Norris*, 118 F.3d 1283, 1287 (8th Cir. 1997). Petitioner's counsel could have made the strategic decision that questioning Reust's interviewing skills would have been just as likely to bolster her credibility, as it would have been to undermine it. Further, counsel could reasonably have believed that the jury was capable of determining whether Reust was being suggestive in her questioning of E.Z.

In summary, the state court's decision was neither contrary to, nor involved an unreasonable application of *Strickland*.

### B.      Brady Violation

Petitioner argues that he is entitled to a new trial because the prosecution withheld exculpatory evidence in violation of his due process rights.  Specifically, Petitioner argues that the prosecutor committed a *Brady* violation when she did not disclose the existence of the verbatim transcript of Petitioner's interview with Alkubani and Keifer until the second-to-last-day of trial. (Tr. IV at 3.)  Although the prosecution had previously disclosed the interview summary, there was no indication that a verbatim transcript had been made of the interview.  Petitioner contends that the prosecution's failure to disclose the verbatim transcript meets the requirements necessary for the Court to find a *Brady* violation because the late-disclosed evidence was favorable to Petitioner, the state had access to the transcript while Petitioner did not, nor could he have obtained access with due diligence, the state suppressed the evidence, and the outcome of the proceeding would have been different if the evidence had been disclosed earlier.

Petitioner identifies two specific instances in which the summary and the transcript were inconsistent to the detriment of Petitioner.  First, the summary suggested that Petitioner had stated that E.Z. was very beautiful, that Raad was a bad mother and that Raad was the type of woman that would be jealous of her daughter's beauty.  As it turned out, the verbatim transcript made clear that it was Keifer who suggested that jealousy might be Raad's motive in bringing E.Z. to the police to accuse Petitioner.  (Tr. IV at 10-19.)  The Court attempted to cure any misperception about who made what statement, by allowing Alkubani to testify that it was Keifer who hypothesized that Raad's jealousy of E.Z. might be a motivating factor in E.Z.'s accusation.

The second instance in which the summary and interview differed concerns Petitioner's statements regarding whether it was possible that E.Z. had seen his penis.  The interview

summary stated that Petitioner absolutely denied that E.Z. could ever have seen his penis, until he was confronted with the fact that E.Z. had described a scar on his penis.  (Pet., App. C, docket #1-1, Page ID#47.)  The verbatim transcript makes clear that although Petitioner stated that E.Z. never saw him naked, he said he did not know if she might have accidentally seen his penis.  (Pet. App. E, docket #1-1, Page ID#66.)

       The Michigan Court of Appeals considered Petitioner's arguments regarding the prosecution's alleged *Brady* violation, and concluded that the prosecution's late disclosure of the verbatim transcript did not violate *Brady*.  The Court stated:

> Defendant next argues that the prosecutor violated *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), in producing a transcript of defendant's statement to the police only on the second-to-last day of trial, after defendant had already testified. Defendant contends that the trial court should have granted a mistrial based on this alleged violation.

> We review constitutional questions de novo. *People v Hrlic*, 277 Mich App 260, 262; 744 NW2d 221 (2007).  We review a trial court's denial of a mistrial for an abuse of discretion.  *People v Dennis*, 464 Mich 567, 572; 628 NW2d 502 (2001).

> As noted in *People v Lester*, 232 Mich App 262, 280-281; 591 NW2d 267 (1998):

> > A criminal defendant has a due process right of access to certain information possessed by the prosecution. *Brady*, [*supra*]. This due process requirement of disclosure applies to evidence that might lead a jury to entertain a reasonable doubt about a defendant's guilt. *Giglio v United States*, 405 US 150, 154, 92 S Ct 763, 31 L Ed 2d 104 (1972). Impeachment evidence as well as exculpatory evidence falls within the *Brady* rule because, if disclosed and used effectively, such evidence "may make the difference between conviction and acquittal." *United States v Bagley*, 473 US 667, 676; 105 S Ct 3375; 87 L Ed 2d 481 (1985).

> >     * * *

In order to establish a *Brady* violation, a defendant must prove: (1) that the state possessed evidence favorable to the defendant; (2) that he did not possess the evidence nor could he have obtained it himself with any reasonable diligence; (3) that the prosecution suppressed the favorable evidence; and (4) that had the evidence been disclosed to the defense, a reasonable probability exists that the outcome of the proceedings would have been different.

The trial prosecutor filed an affidavit in which she stated the following:

4. During the course of the trial, on March 4, 2010, I became aware from the assigned Detective that an actual transcript of Defendant's interview to law enforcement had been translated from Arabic to English. Before this date, I did not know that such a transcript existed and both Mr. Kamar and I only had a synopsis of the interview as prepared by the interviewing officer. As soon as I was able to confirm that such a document did exist, I requested said document and provided same to Mr. Kamar.

5. Mr. Kamar made a motion for a mistrial in response to the disclosure of the transcript.  Judge Giddings reviewed both the transcript and the previously available synopsis and denied the motion for mistrial citing that the synopsis was a fair representation of the content of the interview. Counsel was also allowed to conduct further direct examination of his witness or recall any witnesses who previously testified to address any issues raised by the actual transcript.

Defendant contends that a *Brady* violation occurred here because "[a]lthough the trial prosecutor also received the evidence on the third day of trial, the first prosecutor on the case had previously received it via e-mail and never forwarded it to trial counsel."  Defendant states that "[a]s a full transcription of Mr. Al-Tamimi denying responsibility for the assault, the statement is obviously favorable to the defense."

Defendant contends that prejudice existed and the late disclosure affected the outcome of the trial because of discrepancies between the actual interview transcript and the summary of the interview that both parties had before trial. The summary indicated that defendant "stated that [E.Z.] was very beautiful and felt that [her mother] was a bad mother [and] the type of women [sic] that was jealous of [E.Z.'s] beauty . . . ." The actual interview transcript indicates that the *interviewing officer* suggested that the mother might have been jealous of [E.Z.'s] beauty and that defendant did not respond affirmatively to the suggestion. Defendant contends that

the inaccurate summary damaged him because the prosecutor questioned defendant during his trial testimony about whether he had stated to police that E.Z.'s mother was a bad mother and jealous of E.Z.'s beauty.[3]   Defendant's contention is unavailing, however, because it was made clear during later police testimony that it was an officer who made this suggestion and that the interview summary had been erroneous.

The summary also indicated that defendant initially stated that it was not possible for E.Z. to have seen his penis and then changed his story when confronted with information that E.Z. knew about his scar. The prosecutor questioned defendant about this during his trial testimony, and also elicited from a police officer that defendant had initially said it was not possible that E.Z. had seen his penis. Defendant contends that, in the actual interview transcript, defendant initially stated that he did not know whether E.Z. had ever seen him naked. This is an inaccurate characterization of the transcript by defendant, however, because the transcript progresses as follows:

*Q.* She never saw you naked?

*A.* Once I was coming out of the bathroom and the door was open.

*Q.* May be [sic] she saw you naked.

*A. No, no.*

*Q.* She has never seen you naked?

*Q.* Has she seen your penis accidentally?

*A.* I do not know. How do I know? [Emphasis added.]

Moreover, the transcript does indeed indicate that defendant's description of occasions on which E.Z. may have seen his penis became more numerous and detailed after he was confronted with information that E.Z. knew about the scar on his penis. Contrary to defendant's argument, the available information does not demonstrate that any prejudice was incurred or that the outcome of the case was affected based on the late disclosure of the transcript.

Moreover, the late disclosure dealt with defendant's own words. As such, defendant had access to the information, and we decline to base a reversal on the late disclosure of such information. See, e.g., *People v Taylor*, 159 Mich App 468, 487-488; 406 NW2d 859 (1987) ("[i]n this case we find that defendant was entitled to no remedy for the prosecutor's nondisclosure of the letter in question since the

- 30 -

defendant, having written it himself, had knowledge of it independent of discovery").
The trial court did not err in denying defendant's motion for a mistrial.

    [3] Defendant answered "no."

(MCOA Op. at 6-8.)

        Petitioner cannot establish a violation of his federal due process rights.  Under *Brady*,
"suppression by the prosecution of evidence favorable to an accused . . . violates due process where
the evidence is material, either to guilt or to punishment, irrespective of the good faith or bad faith
of the prosecution."  *Brady*, 373 U.S. at 87.  The Supreme Court has held that "[t]here are three
components of a true *Brady* violation:  [t]he evidence at issue must be favorable to the accused,
either because it is exculpatory, or because it is impeaching; that evidence must have been
suppressed by the State, either willfully or inadvertently; and prejudice must have ensued."  *Strickler
v. Greene*, 527 U.S. 263, 281-82 (1999).  Prejudice (and materiality) is established by showing that
"there is a reasonable probability that, had the evidence been disclosed to the defense, the result of
the proceeding would have been different."  *Id.* at 281 (quoting *Bagley*, 473 U.S. at 682); *see also
Cone v. Bell*, 556 U.S. 449, 469-70 (2009).  A reasonable probability is a probability sufficient to
undermine confidence in the outcome."  *Bagley*, 473 U.S. at 682.

        Even if the Court finds that the prosecution inadvertently suppressed the verbatim
transcript, and even assuming that Petitioner can establish that the verbatim transcript was favorable
to him, he cannot establish that but for the late disclosure of the verbatim transcript there is a
reasonable probability that the results of the proceedings would have been different.  Specifically
with respect to the two inconsistencies Petitioner identifies, it is not reasonably possible that the jury
would have found in Petitioner's favor had it learned that Keifer, and not Petitioner, was the person
who suggested a motive for why E.Z. would accuse Petitioner of criminal sexual conduct, or that

- 31 -

Petitioner denied and then conceded, only after being confronted with E.Z.'s description of his penis, that E.Z. may have seen his penis.

First, ascribing a motive to E.Z.'s accusations was as likely to work to Petitioner's benefit as it would to his detriment. Had the jury believed that Raad had a motive to claim that E.Z. had been sexually assaulted, they might have returned a different verdict. Second, the inconsistency between what the interview summary suggested -- that Petitioner ascribed a motive to Raad -- and what the verbatim transcript stated -- that Keifer ascribed the motive-- was amply cured by Alkubani who repeatedly testified that it was Keifer and not Petitioner who suggested that Raad had a motive to lie. (*See* Tr. IV, 73-74, 79-80.) Finally, although the prosecution asked Petitioner several question regarding whether he made the statements about Raad being jealous of E.Z.'s beauty, Petitioner responded "No" to each question. (Tr. III at 137. ) There is no reasonable probability that had the verbatim transcript been timely disclosed, the jury would have rendered a different verdict based on the fact that Keifer and not Petitioner had ascribed to Raad a motive to claim that E.Z. had been sexually assaulted by Petitioner.

Likewise, it is not reasonably probable that the outcome of the trial would have been different if the jury had learned that Petitioner never claimed that it was impossible for E.Z. to have seen his penis. Even if the jury understood that Petitioner had consistently admitted that E.Z. might have seen his penis on three separate occasions, the jury could still have decided that E.Z. could describe the unique markings on Petitioner's penis not because of these three incidental glimpses, but because Petitioner had sexually assaulted her. At trial and during her interview with Reust, E.Z. testified that Petitioner had orally and anally penetrated her with his penis and she described the scar on his penis. Additionally, E.Z. testified that she saw ejaculate come out of Petitioner's penis and

- 32 -

that Petitioner showed her pornographic movies and directed her "to do what they were doing in the movies." (Tr. I, 44.)  There was ample evidence to support the jury's conclusion that E.Z. was able to describe Petitioner's penis because he had sexually abused her. and not because she had accidentally seen it.

Finally, *Brady* generally does not apply to delayed disclosure of exculpatory information, but only to a complete failure to disclose.  *See U.S. v. Bencs*, 28 F.3d 555, 560-61 (6th Cir. 1994).  Petitioner's counsel was clearly given the verbatim transcript as soon as the prosecutor became aware of it and the Court provided ample opportunity for Petitioner's counsel to cure whatever defect he believed needing curing.  Indeed, Alkubani repeatedly testified as to the confusion regarding who ascribed jealousy as a motive for Raad claiming that E.Z. had been sexually abused.

Based on the foregoing, the state court reasonably concluded that Petitioner's claim regarding an alleged *Brady* violation was without merit.

<u>Recommended Disposition</u>

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied.

Date:  June 11, 2015               /s/ Ellen S. Carmody
                                   ELLEN S. CARMODY
                                   United States Magistrate Judge

**<u>NOTICE TO PARTIES</u>**

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(C); FED. R. CIV. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal.  *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).